## ASSIGNMENT BY A PUBLIC OFFICER OF UNEARNED COMPENSATION.

[Superior Court of Cincinnati—Special Term.]

WALLACE BURCH v. GEORGE B. HARTE, CLERK.

Decided, May 18, 1903.

*Public Officer—Assignment by of Unearned Compensation Against Public Policy—A Referee is a Public Officer—As Between Two Assignments of Fees By—The One Subsequent to the Allowance of will Prevail—Equities as Between Two Assignments—Parties in Interest Under the Code.*

1. An endorser on a note, who procures an assignment by the maker to the holder of unearned fees for services as referee, is not a party in interest under the code, in a suit involving the validity of the assignment.
2. The long established law of England, that an assignment by a public officer of unearned compensation as such is void as against public policy is a recognized rule in Ohio.
3. A referee is a public officer under our law, and an assignment by him of unearned fees falls within this rule.
4. The chief function of a referee is the finding of facts and the conclusion reached as to the law applicable thereto, and until this work is completed and an allowance has been made therefor by the court, there exists in favor of the referee only an inchoate right. It can not be contended, therefore, that having heard certain testimony prior to making the assignment, the assignment was good as to so much of the compensation as had been earned up to that date.
5. An assignee of fees as collateral for a pre-existing debt is not entitled to protection as against a subsequent assignment which was in the nature of a *bona fide* purchase for which full value was given.

HOSEA, J.

The essential facts of the controversy are as follows:

The plaintiff claims the sum of $500 out of a sum of $1,000 in the hands of Harte, Clerk of the Court of Common Pleas of Hamilton County, by virtue of his office, being fees allowed the late Philip Kumler for services as referee in a certain suit. The claim is based on an assignment, in writing, from said Kumler dated September 28, 1899, and filed with said clerk.

Upon motion of the clerk an order of interpleader was duly entered, and Scott Bonham and C. D. Robertson, made defendants, have filed answers and cross-petitions—both the latter standing upon an assignment from Kumler to Bonham executed August 30, 1898, and notice thereof given the said clerk on October 17, 1898.

The connection of Robertson with the matter is only indirect and incidental. He is indorser upon a note given by Kumler to Bonham in 1893, and procured the assignment by Kumler to Bonham in 1898 as collateral to said note in relief against his own liability as endorser. This does not make him a "party in interest" under the code. Bonham's answer and cross-petition in his own behalf covers all legal interest in this regard, consequently Robertson may be dismissed as an unnecessary party to the action.

It further appears that at the date of the Bonham assignment in 1898 a number of hearings had been had by the referee, but no report had been made by him, and no allowance of fees had been made by the court.

The first allowance for services rendered was made and entered by the court on July 24, 1899, for the sum of $500; and on September 28, 1899, Kumler assigned said allowed sum (or, as he expressed it, his "judgment for costs, amounting to $500"), to the plaintiff, Burch, for a consideration of $450, cash paid to him therefor, which assignment is the predicate of this action.

Considerations of an equitable nature were touched upon in the very able arguments of counsel; but these must abide the determination of the main question involving the validity of the Bonham assignment.

The plaintiff contends that under the rule long established in England, and by many authorities in this country, the assignment by a public officer of his unearned compensation as such, is void as against public policy.

It is urged by defendant, (1), that this rule is not recognized in Ohio; and (2), that if it were, it has no application to a "referee" under our law.

The main doctrine, holding such assignments invalid, has long been the law of England. In *Hill* v. *Paul,* 8 Clark & Finnell,

307, Lord Chancellor Lyndhurst quotes, as showing the law at a much earlier date, a terse expression of Lord Eldon, namely:

"A pension for past services may be alienated; but a pension for supporting the grantee in future services is inalienable."

In *Liverpool* v. *Wright*, L. J. (N. S.), Ch. 871 (1859), Wood, Vice-Chancellor, discussing the reasons on which the doctrine rests, says:

"There is a second ground of public policy, for which the case of *Palmer* v. *Vaughn* (3 Swanst., 173) is the leading authority, which is this: That nobody can deal with the fees of a person who holds an office of this description (clerk of the peace), because the law presumes, with reference to an office of trust, that he requires the payment which the law has assigned to him for the purpose of upholding the dignity and performing properly the duties of that office; and therefore it will not allow him to part with any portion of those fees either to the appointer or to anybody else. He is not allowed to charge or incumber them. * * * Any attempt to assign any portion of the fees of his office is illegal, on the ground of public policy, and held therefore to be void."

Many other English cases, both earlier and later, reiterate the same doctrine without dissent.

In this country the case of *Bliss* v. *Lawrence,* 58 N. Y., 442 (1874), is generally regarded as the leading one. It arose upon an assignment by a clerk in the U. S. Treasury Departmnet of a month's salary in advance.

The court says:

"The controlling question in these cases is that of the lawfulness of assignment by way of anticipation of the salary to become due, of a public officer. * * *

"Salaries are by law payable after work is performed and not before: and, while this remains the law, it must be presumed to be a wise regulation and necessary, in the view of the law-makers, to the efficiency of the public service. The contrary rule would permit the public service to be undermined by the assignment to strangers of all the funds appropriated to salaries. It is true, in respect to officers removable at will, that this evil could in some measure be limited by their removal when they were found assigning their salaries; but this is only a partial remedy, for there would still be no means of preventing the recurrence of the same difficulty. If such assignments are allowed, then the assignees,

by notice to the government, would, on ordinary principles, be entitled to receive pay directly, and to take the places of their assignors in respect to the emoluments, leaving the duties, as a barren charge, to be borne by the assignors. It does not need much reflection or observation to understand that such a condition of things could not fail to produce results disastrous to the efficiency of the public service."

The court discusses the English authorities, and continues:

"Similar questions have arisen in respect to persons *not strictly public officers;* but the principle before stated has in the courts of England been adhered to firmly.  *   *   *
"The substance of it all is the necessity of maintaining the efficiency of the public service by seeing to it that the public salaries really go to those who perform the public service. To this extent the public policy of every country must go to secure the end in view."

The general rule thus indicated has been followed and adopted in many states in a number of cases, of which the following are examples: 81 Alabama, 266, *Schloss* v. *Hewitt;* — Arizona, ——, *King* v. *Hawkins;* 66 California, 72, *Bangs* v. *Dunn;* 4 Indiana, 1, *Ellis* v. *State;* — Kentucky, 63 S. W. Rep., 280, *Holt* v. *Thurman;* 118 Missouri, 146, *State* v. *Williamson,* Mail Carrier; 110 Michigan, 203, In re King; 49 New Jersey L. R., 144, *Wayne Tp.* v. *Cahill;* 141 New York, 9, In re Sara Worthington et al, Executors; 67 Penn. St., 361, Elwyn's Appeal, Retired Army Officer; 17 S. Carolina, 585, *Butz* v. *Charleston;* 10 S. Dakota, 306, *State* v. *Barnes;* 86 Texas, 303, *Bank* v. *Fink,* County Assessor; 42 W. Virginia, 229, *Stevenson* v. *Kyle;* 36 Federal Reporter, 147, *Shannon* v. *Bruner,* Master in Chancery.

It is also adopted by text-writers: Story's Equity, Section 1040*d;* Mechem on Public Officers, Section 874; Greenhood on Public Policy, 351 (Rule 297).

The Alabama case of *Schloss* v. *Hewitt,* above cited, gives this very excellent statement of the reasons for the rule:

"It is very easy to see how great abuses would follow if such transfers were permitted. Not only would there exist a constant temptation to anticipate future earnings under the stress of present financial pressure at usurious rates of discount, but, when completed, one of the strongest incentives to industrious exertion—

the expectation of pecuniary reward in the near future—would be gone."

Another well considered case is that in 86 Texas 303, cited above. The Court of Appeals of 4 Jud. Cir. certified the following question:

"Is it contrary to public policy in this state for a public officer (he having qualified and been in office) to gave a lien upon his unearned official compensation?"

The officer was an assessor, and the court, after citing a formidable list of English and American authorities, says:

"There is no distinction between the assignment of *unearned fees* and the assignment of *unearned salary*. If anything, the reason is stronger for holding such assignments of fees void than for holding a like assignment of salary to be invalid; because a salary is a fixed sum for a given time, and there could be no doubt as to the amount to which the assignee would be entitled; while in the case of fees to be paid by the county or state, the officials would be required to go into a settlement of the question of amount, with many different persons in some instances, which would confuse and embarrass the public business."

In 122 New York, 478, *Bowery Bank* v. *Wilson*, the court employs similar reasoning, overruling a case in 50 How. Pr. Rep., 143, upon the assignment of the unearned fees of a justice of the peace; and the same rule is applied again in 155 N. Y., 412.

Only one case squarely repudiates the doctrine, namely, 15th Wisconsin, 83, *State* v. *Hastings;* but this latter case has been disapproved in many subsequent decisions; among them being 66 California, 72; 86 Texas, 303; 118 Mo., 146; and 122 N. Y., 478. The Texas court, in the case above cited, thus voices the general disapproval:

"So slight a consideration of the number of cases decided by courts of eminent ability shows that the court in that case (*State* v. *Hastings*), did not give sufficient thought to the question involved to entitle the opinion to weight."

7 Metcalf (48 Mass.), 335 (1844), was cited at the hearing as opposing the rule; but upon examination I do not so consider it. In that case the question of public policy, though incidentally men-

tioned by counsel, was not considered, since the judgment proceeds solely upon the finding that the assignment of salary covered a possibility coupled with an interest, and not a mere naked expectancy.

This case has been distinguished in other subsequent cases, notably, the 58th New York and the 118th Mo.; and is practically repudiated in a later Massachusetts case, 79 Mass. (13 Gray), 200, which holds that the quarterly salary of a public school teacher, holding under an annual salary payable quarterly, can not be reached by trustee proceedings, (similar to garnishment in Ohio) prior to the completion of the quarter, upon any theory of proportional earning for time served. The court say:

"It was not a debt and might not become a debt; the contract was entire, and, until completed on the part of the teacher, nothing was due."

There is an expression of doubt by the authors of Pomeroy's Equity (who are California lawyers), in a note to Section 1276, as to the applicability of the English rule to the conditions of this country, and their belief that the American law will not go beyond statutes upon the subject; but the authors cite only a meagre list of authorities, and those relate solely to the effect of special United States statutes prohibiting assignments. No question of public policy was involved in those cases, excepting that the United States statute in question is to all intents a practical embodiment of the doctrine of public policy under consideration.

In view of the decided weight of authority in favor of this doctrine, of character and number of eminent authorities upholding it, and of the cogent reasons advanced for its support, I feel constrained to accept and apply it as law for this case, unless, indeed, there exists controlling authority in Ohio to the contrary; or, upon due consideration, I shall be satisfied that a "referee" under our law is not a "public officer" within the scope of the rule.

But in view of defendant's contention that, at the date of the assignment of August, 1898, the referee had already had a number of sittings, and had, therefore, to some extent at least, already *earned* fees, it must be premised that the mere taking of testimony is but the basis and preparation for that duty which the referee is to perform, namely, to consider, decide and report upon

the facts thus elicited. The real duty, which is the chief function of the referee, is the *"finding"* of facts and the *"deciding"* upon the law applicable thereto. If, for example, a referee should die after "hearings," but before finding and decision, the work done would avail nothing. His successor must begin *de novo*. It seems but reasonable, therefore, to conclude that the mere preliminary labor of the referee, however onerous, required in order to enable him to discharge the real function of his office, is not the thing for which compensation is provided, apart from its final completion and result.

The case in 79 Massachusetts, among others already cited, is an authority on this point; and a still more pertinent authority is 141 New York, page 9, to which I shall have occasion to refer later, together with Ohio authority.

Upon both reason and authority it must be held that the subject of the assignment of August, 1898, was the *unearned* fees of the referee, and the defendant can derive no benefit from the fact that some labor had already been performed; for, under our statutes, the fees of a referee are to be determined and "allowed" by the appointing court, and, until so allowed, there exists but an inchoate right.

Coming now to the question whether a referee, under Ohio statutes, is a "public officer" within the rule of public policy herein considered, it is to be noted at the outset that the Constitution of Ohio does not employ or define the term *"public* officer." It is in this respect—as Webster characterized the Federal Constitution— "An instrument of enumeration rather than of definition."

Article II, Section 27, provides that:

"The election and appointment of *all officers* shall be made in such manner as may be directed by law."

Under this section our Supreme Court, in 7 O. St., 647, *State* v. *Kennon*, hold that emolument is a usual but not necessary element constituting an office; that *authority and power relating to the public interest,* conferred by statute, and which may be vested in a board or individuals, by election or the appointing power of the state, constitute an "office." "Whatever less than this may

constitute an office"—the court holds—is "unnecessary to determine." (See also 29 O. St., 102, *State* v. *Covington*).

The section quoted, and the decision explaining it, taken in connection with Article II, Section 29, specifying three classes of public servants, namely, "officer," "public agent" and "contractor," suggest a reason for the distinction between a "public officer," properly so called, who is *invested with some authority and power of the state,* and subject therefore to certain responsibilities peculiar to the public service rendered necessary by the interests of the public, and a mere "agent" or "contractor" upon whom no such responsibility rests. Certain requirements relating to personal eligibility to office are also specified in the Constitution, as, that one must be an elector, must not be a duellist, and must take an oath, etc. (Article XV, Sections 4, 5 and 7).

Referees, under our code, are clearly adjuncts to the judicial system of the state; and clothed, to some extent at least, with the powers and duties of the judicial office. Our statutes provide for their appointment by a court, with or without the consent of parties, prescribe their duties, require an official oath, and provide for compensation to be allowed by the court in its discretion. Section 5213 of the Revised Statutes provides that a "trial by referees shall be conducted in the same manner as a trial by the court," with power to "summon and enforce the attendance of witnesses, administer necessary oaths in the trial"; "grant adjournments the same as the court", "find facts", state "conclusions of law" and give "decisions" which may be excepted to and reviewed, and which, unless the reference be merely to report facts, "stand as the decision of the court," and upon which "judgment may be entered in the same manner as if the action had been tried by the court."

The object and purpose of the appointment of referees, as will appear more fully by reference to the multitude of statutes designating the various classes of questions that may be submitted to them, is to relieve the courts, and contribute to the due and speedy administration of justice in the general interest of the public, by doing detail work. This is illustrated in the case at bar, by the referee's appointment to ascertain the identity of numerous stockholders, and to proportion and assess their statutory liability.

Our Supreme Court has had occasion to consider this matter somewhat, and its views are instructive in this connection. Thus, in 7 O. S., 132, *Lawson* v. *Bissell*, the court say:

"Instead of submitting the case to a jury or court, the code provides for a third mode of deciding the issues of fact and law, and this is by referees. *The referees are substituted for the court and jury;* and their province is to decide the facts of the case, if facts only are submitted, or both facts and law, if both are referred. * * * These provisions of the code show very clearly that while the trial before referees is subject to the review and revision of the court ordering the reference, it is a substitute for a trial in court. The finding of facts is, in effect, the special verdict of a jury. *The conclusions of law of the referees stand as the law decision of the court, and, if not set aside, a judgment follows of course.*"

25 O. S., 402, *Bell* v. *Crawford,* discusses the effect of the preceding case on reports of master commissioners, and is valuable as an exposition of the duties and powers of master commissioners and referees.

33 O. S., 336, holds, *passim,* that—

*"The referee is substituted for the court, and the cause proceeds before him as though it was tried in court and upon submission."* (Citing above cases).

In the light of the statutory provisions and of the judicial comments cited, it is difficult to see why a referee, under Ohio laws, is not a "public officer," in a reasonable and proper sense within the general doctrine of public policy under discussion. There can be no question that a judge of a court of record is a public officer, because the nature of his duties make him one of the agencies for administering one of the three great powers of government, apportioned by the Constitution between the three administrative departments of the state—the legislative, the executive and the judicial. The "referee," under our law, is, as declared by the Supreme Court, a "substitute for the court and jury," and falls quite within the definition of Mechem, in his work on "Public Offices and Officers," as follows:

"Section 2. A public office is the right, authority and duty created and conferred by law, by which, *for a given period, either*

*fixed by law or enduring at the pleasure of the creating power,* an
individual is *invested with some portion of the sovereign functions
of the government, to be exercised by him for the benefit of the
public. The individual so invested is a public officer."*

Indeed, the referee seems to fall also within the limited defini-
tion of the same author, which discriminates between an office and
mere employment or contract, for here is a *"delegation to the indi-
vidual of some of the sovereign functions of the government to be
exercised by him for the benefit of the public."*

The case of *Estate of Hathaway, Deceased,* 71 New York, 238,
has been cited as authority for the opposite view; but upon careful
reading it will be found, that, while the court uses expressions
that without the context might seem to be of general application,
it was in reality dealing with a purely technical question, under a
clause of the Constitution of New York prohibiting the justices of
the Supreme Court from exercising "any power of appointment to
public office." The holding, therefore, that referees, receivers, etc.,
were not "public officers *within the inhibition of the Constitution,"*
and therefore could be appointed by the judges, is purely technical
and local, and is not applicable as a countervailing authority under
the more general considerations of public policy involved here.

It will not pass without notice that the same court that held
"referees" *not* to be *"public officers,"* under a clause of the Con-
stitution of New York, is the leading authority for the doctrine
under consideration (58 N. Y., 442); and that in a much later
case (141 N. Y.), already cited, applied it even to executors, as
we shall see.

As an off-set to this decision, in any aspect, the ruling of Justice
Brewer of the U. S. Supreme Court, then circuit judge, in 36 Fed.
Rep., 147, *Shannon* v. *Bonner,* may be now more particularly re-
ferred to as showing that the doctrine under consideration is not
so limited. The question was upon the validity of an assignment
of the unearned fees of a master in chancery, and the court says:

"Now, can an officer make an assignment, in advance, of his
fees or salary? The law is very clear that he can not. Public
policy has affirmed the necessity of securing to every public officer,
when earned, his fees or salary, unhindered by any present legal
attack or any previous voluntary assignment. There are many

cases, both in England and this country, affirming the necessity of upholding such public policy."

After citing 58 N. Y., 442, and discussing the Wisconsin case in opposition, he continues:

"But the general voice of authority, both across the water and here, is, that no voluntary assignment can be sustained by a public officer of fees or salary yet to be earned."

It will be sufficiently obvious, that for the practical purposes of this case a master and a referee are substantially interchangeable quantities, although the duties and powers of the master are usually of a somewhat more limited nature; so that the views of Justice Brewer apply with equal if not with greater force to referees.

Counsel for the defense, by way of the *reductio ad absurdum,* cite the case of notaries public, who they say are, in a sense, "judicial officers," yet not *"public officers"* under our Constitution. But a notary public is, in fact, one of the few thus expressly recognized in that instrument. Article II, Section 4, refers to notaries public as "holding *office* under the authority of the state," and therefore as "public officers" in the sense of the argument used.

We pass now to the consideration of such Ohio cases as bear more or less directly upon the questions at issue.

The case of the *City of Newark* v. *Funk & Bro.,* 15 O. S., 462, holds that the salaries of officers of incorporated cities, due and unpaid, may be subjected by judgment creditors to payment of their judgments under Section 458 of the Code (R. S., 5464).

It appears to have been contended that it was "against public policy to permit salaries and pay of their officers and public agents to be so garnisheed."

The court holds otherwise, but says (p. 464):

"We do not say or suppose that a salary which is not yet earned, or for the payment of which the proper period has not yet arrived, can be so garnisheed or attached. It must be a subsisting claim, due or to become due, and for the ultimate payment of which the obligation to pay is fixed without reference to future acts or considerations."

This obviously excludes fees yet to be "allowed"—the payment of which depends not only upon the completion of the service, but upon the allowance by a court thereafter.

17 O. S., 591, *Porter* v. *Dunlap*, was cited by the defense in opposition to the general doctrine. A public school teacher, under annual salary, payable in quarterly installments, assigned his quarter's salary, in advance, to the township treasurer, authorizing him to retain it out of the money to come into his hands for the quarter's service, and subsequently, after receiving the order on the treasurer at the conclusion of the quarter for the salary then due, transferred the order to another, who had no notice of the former transfer. The court sustained the claim of the treasurer as a prior equity, coupled with possession, treating the agreement of the teacher allowing the treasurer to retain the money out of funds which must eventually come through him, as collateral to the assignment, and creating an estoppel against the subsequent assignee in virtue of the acts of the assignor.

It does not appear that the doctrine of public policy, under present consideration, was invoked in the case, or was in any way referred to. The prior assignment was attacked upon grounds of public policy, indeed, but of an entirely different character.

But, under the views and authorities before cited, it may well be that neither court nor counsel regarded a school teacher as a "public officer" in any sense, under the doctrines here discussed.

An almost precisely similar case will be found in 78 Ill., 143 (*Johnson* v. *Pace*) in which the action of the court was similar, and in the opinion there is this hint as to the reason:

"Nor do we discover here any such violation of duty or improper practice, as school officers, as is claimed by appellants, which should deny to Holmes (the prior assignee) the benefit of this money."

But the case contains no suggestion otherwise that the assignment was questioned on such grounds.

40 O. S., 396, *Caran* v. *Little,* decided by the S. C. Commission, presents a case of an assignment by a city solicitor of a quarter's salary in advance; but there is in it no hint or suggestion that the question of public policy was raised or considered. The suit turned upon the question of liability of the endorser of the order, and involved no question pertinent to the present consideration.

The case of *Overturf* v. *Gerlach,* 62 O S., 127, decided at the January Term, 1900, is important in its recognition of the public

impolicy of permitting the unearned fees of a public officer to be sequestered.

The suit was against an executor under Section 5464, Revised Statutes. The court distinguishes the case of *City of Newark* v. *Funk* (15 O. S., 462), and draws special attention, as I have done here, to the express limitation embodied in it.

The court further say:

"While the embarrassment that might affect the public service in the attachment of the salary of a public officer was not regarded in that case of such a grave character as on grounds of public policy to forbid its adoption by a creditor, yet its impolicy in the case of administrators, for the reasons stated, is more apparent than in the case of public officers, and has not been sustained by any court."

In discussing the nature of the executor's compensation, the court say:

"Overturf *may not be entitled to the compensation* and commissions provided by law at the final settlement. *This will depend upon the judgment and allowance of the probate court.* By reason of maladministration he may be entitled to nothing, and nothing may be allowed him. Hence, *until the estate has been settled, or some allowance has been made him by the probate court, it can not be said that there is anything due him therefor.*"

The syllabus of the case is as follows:

"Until allowed by the court, the compensation and commissions of an executor * * * can not be attached, or by any similar process appropriated to the payment of his claim by a creditor of such executor."

The Ohio case just cited forms an instructive supplement to that in 141 N. Y., 9, In re Worthington et al, Executors (*supra*), in which an executor assigned his commissions, in advance, and was subsequently removed for mental incapacity and died—all prior to his filing of final account and allowance of fees and commissions by the court.

The opinion of the court brings so fully and clearly into review underlying reasons which seem to me applicable to the case at bar, as to justify liberal quotation.

Says the court:

"It may be conceded that the assignment of the commissions was made for a good consideration, and that the removed executor had actively participated for many years in the management and administration of the estate, and that the representatives were therefore entitled to some consideration upon the final allowance of commissions by the surrogate. The difficulty in the way of appellant is of another kind. *Until ascertained and liquidated, at the times and in the manner authorized by law, the commissions are not subject to the executor's disposal, but the right to them is inchoate, and, upon grounds of public policy, unassignable.* There is no fundamental distinction in this respect between public and private trusts, where the statute fixes the compensation and prescribes that it shall not become due and payable until the service has been rendered, or at stated periods during the term of service. It is well settled that a public officer can not, during his official term, and before his salary or fees become due and payable, make a valid assignment of such salary or fees (*Bliss* v. *Lawrence,* 58 N. Y., 442; *Bowery National Bank* v. *Wilson,* 122 N. Y., 478). * * * If the emoluments of the office might be separated from it and transferred to another, it would leave the duties of the office as a barren charge to be borne by the incumbent. It is evident that transfers of this kind would not tend to promote activity and care in the discharge of official obligations. *The same considerations forbid the recognition of an assignment, by an executor, of his commissions in advance of the time provided by law for their adjustment and payment.* When the hope of compensation is gone, a strong incentive to diligence and zeal is wanting, and the temptation to be content with a lax and perfunctory administration of the trust becomes more persuasive."

When it is considered that the functions of a referee, under our statutes, are not simply of an administrative character, as are those of an executor, but involve the exercise of judicial powers in hearing and rendering decisions upon both the law and the facts, which in some cases stand as and for the decisions of the court itself, it must be admitted that the reasons given by the New York Court of Appeals apply with even stronger force to referees. The question arising upon the application of the doctrine under discussion is not one to be determined upon a mere technical definition of the term "public officer," such as might be necessary under a power of appointment embodied in a state constitution, but is, whether the duties to be performed in relation to the governmental

powers of the state and for the public benefit, are such as establish a proper basis for the application of a rule of public policy thoroughly settled by the great weight of authority.

Upon careful consideration of all authorities cities (and many others) I am clearly of opinion that the rule of public policy holding void the assignment of the unearned fees of a public officer is a most salutary one and should be upheld and enforced in cases like the present where duties of a public nature are to be performed, compensation for which depends upon allowance by a court.

In no one of the Ohio cases, so far as I have been able to ascertain, has the doctrine of public policy herein discussed been brought distinctly before the court as the basis of decision. The dicta in *City of Newark* v. *Funk,* refer to salaries already earned and due; as to which no question has been raised. The case of *Porter* v. even if it be taken as fixing a point of limitation beyond which the *Dunlap* may be distinguished upon grounds already indicated; but application of the rule of public policy should not be carried, still the case at bar falls clearly within and not without such limitation. The case of *Caren* v. *Little,* was not one of conflicting claimants, and was controlled by considerations so diverse from those involved here, it can hardly be regarded as pertinent in any degree.

Therefore I do not find any objection, either in the letter or spirit of Ohio decisions, to the application of the doctrine of public policy upheld by the authorities cited to facts such as presented by the case at bar.

A further question, suggested during the argument, seems to me upon further consideration to be also decisive. The prior assignment was not given upon a moving consideration applicable thereto but as an additional and collateral security for a pre-existing debt, namely, a note given by Kumler in 1893, endorsed by Robertson— being a wholly different transaction, having no connection with the appointment or services of Kumler as referee.

It is well settled that, in a contest between successive equities, the rule *"prior in tempore prior est in jure"* can be invoked where equities are equal, but not otherwise—and it is equally well settled

that one who takes an assignment for a pre-existent debt, is not a bona fide purchaser and entitled to protection against one who pays actual and full value upon the faith and credit of the thing assigned—one "who has actually parted with his property upon the credit of the estate." (4 Paige, 215).

These are familiar doctrines of equity, applicable wherever kindred circumstances arise.

As applied to circumstances closely analogous to those of the case at bar, they will be found very fully discussed in the case of The Elmbank, 72 Fed. R., 610 (particularly p. 617, *et seq.*) citing many state decisions illustrating the general principle. The case covers also the question of notice as it arises here, and is conclusive.

I hold, therefore, as between the two assignments under consideration that, upon both or either of the grounds stated, the assignment given to Burch, the plaintiff, must prevail, and judgment is rendered accordingly.

*Burch & Johnson,* for plaintiff.
*Scott Bonham,* contra.